Nanette Dembitz, J.
In this juvenile delinquency proceeding in which the 15-year-old respondent is charged with possession of heroin, his motion to suppress the evidence — the alleged heroin — is granted. The court must reject petitioner’s argument that the heroin seizure was valid under CPL 140.50 (the “ Stop-and-frisk ” law).
According to petitioner policeman’s uncontradicted and credible testimony, the stop-and-frisk was based on the following observations: Four male youths were sitting in a double-parked automobile; respondent got out and walked into a basement entrance-way; a minute or so later he started walking back towards the car; as the policeman in a marked police car drove abreast the other automobile, a passenger in its back seat waved respondent away from the car (gesturing to him to walk to the *520 corner); respondent walked past the car towards such corner, glancing back; when the policeman then approached the corner from a different direction, respondent was standing on it and two of the youths who had also been occupants of the automobile, were walking towards respondent; as soon as the police car came into such youths’ line of vision, they abruptly swerved into a store; respondent then looked over his shoulder, apparently saw the police car, and walked away from it. The policeman ordered him to stop and to put his hands against a wall; respondent stopped with one hand clenched; when he opened it in response to the policeman’s demand to know what he was holding, he had a glassine envelope. Petitioner sought to introduce such envelope into evidence together with proof that it contained heroin.
ILLEGALITY OE STOP
The policeman’s observations constituted grounds for a reasonable suspicion that respondent was fleeing from the police, as respondent’s counsel in effect concedes. She ably argues, however, that his reasons for flight may have been innocent. But, the stop-and-frisk law does not require a high probability of criminality (CPL 140.50; see People v. Rosemond, 26 N Y 2d 101, 104; Adams v. Williams, 407 U. S. 143, 147); the likelihood that a persistent flight like respondent’s is attributable to recent, current or imminent criminality, justifies reliance on it as a substantial ground for a stop-and-frisk. (See Sibron v. New York, 392 U. S. 40, 62, 66.) The facts, in addition to flight, held adequate to sustain a stop-and-frisk, have at times been meager. (See People v. Rivera, 14 N Y 2d 441, 444, 445, cert. den. 379 U. S. 978 [cited in Sibron v. New York, 392 U. S. 40, 64, and quoted with approval in Terry v. Ohio, 392 U. S. 1, 11, upholding the constitutionality of stop-and-frisk laws].)
Nevertheless, it seems clear that the stop-and-frisk law envisages a reasonable suspicion of a particular crime. i( There must be something at least in the activities of the person being observed or in his surroundings that affirmatively suggests particular criminal activity, completed, current, or intended.” (Sibron v. New York, 392 U. S. 40, 73 supra [Hablan, J., concurring] ; see, also, Sibron, 392 U. S. at p. 74.) The premise that the justifying circumstances must point to a particular crime, runs through the stop-and-frisk decisions; a major determinant of the justification for a weapons frisk is the nature of the suspected crime. (See People v. Moore, 32 N Y 2d 67, 70; People v. Mack, 26 N Y 2d 311, 317-318; Terry v. Ohio, 392 U. S. 1, 23, 28.)
*521 The requirement of particularity is supported by the constitutional guarantee that the individual’s right to liberty and privacy will be balanced against the public interest in detecting and preventing crime. Justification for an invasion of a person’s liberty on suspicion rather than probable cause lies largely in the “ need for immediate action ” against him (Sibron v. New York, 392 U. S. 40, 73, supra, Harlan, J., concurring; loo cit., People v. Moore, 32 N Y 2d 67, 70, supra). In prevention of crime — a primary goal and use for stop-and-frisk[1] — the need for immediate action is most sharply presented when there is reasonable suspicion of imminent criminality. And, unless the suspect’s preparations have ripened to such a stage that his conduct points to a particular crime, imminent criminality, justifying a preventive invasion of individual liberty, seems unlikely.
Here there were no circumstances pointing to any particular crime. While flight by a person who has not been seen to commit a crime gives rise to a reasonable suspicion that he is carrying something he wants to hide from the police, that category includes a wide variety of objects. Accordingly, the policeman’s stopping of respondent was illegal and unconstitutional.
ILLEGALITY OF FRISK
Since the stopping of respondent was invalid, the frisk was necessarily also invalid. But even assuming arguendo that the stopping of respondent was justified, it is obvious that the policeman had no basis for a self-protective frisk for weapons. Certainly respondent could not reasonably be suspected of having a dangerous instrument concealed in the palm of his hand, and a frisk for the purpose of finding evidence is impermissible. (Sibron, 392 U. S. 40, 64, supra; Terry, 392 U. S. 1, 24, 29, supra.) The authority to frisk cannot be so extended that it nullifies the constitutional prohibition of a search except upon a valid warrant or a valid arrest.
EXCLUSION OF IGLASSINE ENVELOPE SEIZED FROM RESPONDENT
The precedents establish that an object seized in an illegal stop-and-frisk is inadmissible in a juvenile delinquency trial as it is in a criminal prosecution. (Matter of Audino M., 43 A D 2d 92, 95.) However, grave doubt has been expressed as to whether this exclusionary rule serves its major purpose of deterring illegal seizures, and legislation to supply a more *522 effective and desirable sanction for violations of the Fourth Amendment of the Constitution has been urged. (Bivens v. Six Unknown Named Fed. Narcotics Agents, 403 U. S. 388, 416-424 [Burger, C. J., dissenting].) In view of the number of careful analyses of the deficiencies of the exclusionary rule (collated and extended in Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 IT. Chi. L. Rev. 665), this opinion will only add a few observations.
The hope of deterrence through the exclusionary rule rests largely on an assumption of a policeman’s identity of interest with prosecuting attorneys — an assumption of the policeman’s personal interest in avoiding stops, arrests, and seizures that result in suppressions of evidence and in unsuccessful prosecutions. In New York City, however (which apparently is typical), the Police Department keeps no record connecting the ultimate result of an arrest with the arresting policeman, nor has he ordinarily prearrest contact with prosecuting attorneys, nor is there ordinarily any feedback on the result of a motion to suppress evidence unless it is decided from the Bench. While a policeman frequently observes or follows a suspect for a period before the stop or arrest, his motivation generally seems to be his need to secure grounds for an accusation rather than legal justification for a seizure.[2]
Further, while the exclusionary rule in State prosecutions was promulgated in relation to a ruthless and flagrantly invalid seizure (Mapp v. Ohio, 367 U. S. 643, 645), most of the reported cases in which it is now being applied (and many of the unreported ones within this court’s knowledge), involve analyses of legality of such a refined and borderline nature that Judges disagree as to the seizure’s validity. Such exclusionary rulings could hardly furnish on-the-spot direction for even the most law-abiding policeman. Again, in the event of a flagrant abuse of the Fourth Amendment, a policeman might be discomfited by a prosecuting attorney’s refusal to prosecute, or by its exposure on cross-examination on a motion to suppress, or by the grant of the motion from the Bench. To the extent that such experiences might deter the police from illegality, these brakes would fail to function when exclusion of the evidence involves borderline considerations.
*523 Finally, from the standpoint of the Government’s role as moral preceptor (see Terry v. Ohio, 392 U. S. 1, 13, supra), in borderline suppression cases a Judge often doubts the moral impact on any party of her explanation of the reason for the dismissal of a gun charge, for example, without any consideration of the guilt of the accused. Thus, it appears that the exclusionary rule is of doubtful efficacy in accomplishing any of its purposes.
Even if the Fourth Amendment were meticulously obeyed by the police, stops-and-frisks on reasonable suspicion would necessarily result in the invasion of the liberty of more innocent people than would arrests on the more exigent criterion of probable cause. In the poorer areas where stops-and-frisks generally occur, abuse of this investigatory procedure has the potential for causing widespread indignities and resentments. Accordingly, a more effective and appropriate remedy than the exclusionary rule is of as great or greater importance in regard to illegal street stops as illegal arrests. (Cf. Warren, C. J. in Terry v. Ohio, 392 U. S. 1, 13-15, supra, indicating the exclusionary rule’s lesser effectiveness in deterring illegal street stops than illegal arrests.)
As Chief Justice Burger pointed out (Bivens v. Six Unknown Named Fed. Narcotics Agents, 403 U. S. 388, 420, supra), until a ‘ ‘ meaningful alternative ’ ’ to the exclusionary rule is developed legislatively, it must be enforced despite its deficiencies. Respondent’s motion to suppress the evidence against him is granted and, there being no other evidence in support of the petition, the petition is dismissed.

. See People v. Peters (18 N Y 2d 238, affd. on other grounds 392 U. S. 40); People v. Rivera (14 N Y 2d 441, 442, supra).

. Assuming the validity of the inference of police perjury in “ dropsy ” and similar cases (see People v. McMurty, 64 Misc 2d 63); but see Oaks, 37 U. Chi. L. Rev. 665, 699), such perjury only shows an after-the-illegality interest in the prosecuting attorney’s success.