# Indemnification of Department of Justice Employees

The Attorney General may use funds from the Department of Justice's general appropriation to indemnify Department employees for actions taken within the scope of their employment.

February 6, 1986

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum responds to your request for this Office's opinion on the question whether you have authority to indemnify Department of Justice employees against personal liability for actions taken within the scope of their employment. Funds for the indemnification would come from the Department's own appropriation.

In an opinion issued in 1980, this Office expressed the view that the Attorney General does have such authority.[1] We have carefully re-examined that opinion and, for the reasons discussed below, continue to adhere to the view that the Attorney General may lawfully authorize the indemnification of Department employees for adverse money judgments (as well as for settled or compromised claims) arising out of actions taken within the scope of their employment.

As noted in this Office's 1980 opinion, the Attorney General has plenary authority to conduct and supervise all litigation in which the United States has an interest. This power derives generally from the Attorney General's position as the chief legal officer of the federal government. See 28 U.S.C. §§ 516–519; 5 U.S.C. § 3106. "Included within the broad authority of the Attorney General to carry on litigation is the power to compromise." "Settlement Authority of the United States in Oil Shale Cases," 4B Op. O.L.C. 756 (1980) (footnote omitted). See generally United States v. San Jacinto Tin Co., 125 U.S. 273, 284 (1888); 38 Op. Att'y Gen. 98 (1934).

Under this general authority, the Attorney General has long taken steps to defend Department employees sued for actions taken within the scope of their employment. As stated in 1858 by Attorney General Black:

> When an officer of the United States is sued for doing what he
> was required to do by law, or by the special orders of the

---

[1] Memorandum to Alice Daniel, Assistant Attorney General, Civil Division from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (Aug. 15, 1980) (1980 Opinion). See also Memorandum to Richard K. Willard, Assistant Attorney General, Civil Division from Ralph W. Tarr, Deputy Assistant Attorney General, Office of Legal Counsel (Oct. 4, 1984) (commenting on 1984 Civil Division Representation Study); Memorandum for the Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (Nov. 5, 1981) (suggesting that the Attorney General establish a policy on this issue).

Government, he ought to be defended by the Government. This is required by the plain principles of justice as well as by sound policy. No man of common prudence would enter the public service if he knew that the performance of his duty would render him liable to be plagued to death with lawsuits, which he must carry on at his own expense. For this reason it has been the uniform practice of the Federal Government, ever since its foundation, to take upon itself the defense of its officers who are sued or prosecuted for executing its laws.

9 Op. Att'y Gen. 51, 52 (1858). *See also* 5 Op. Att'y Gen. 397 (1851).[2]

The gradual erosion of the doctrine of sovereign immunity culminated in the enactment of the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680, which permits suit to be brought directly against the United States once administrative remedies have been exhausted. Although enactment of the FTCA initially led to a decline in the number of suits against individual officers, the problem emerged afresh after the Supreme Court's decision in *Bivens* v. *Six Unknown Named Agents*, 403 U.S. 388 (1971), holding that damages may be obtained against federal officers who have violated the constitutional rights of private individuals. *Bivens* and its progeny have led to a steadily increasing stream of damage actions against government employees sued in their individual capacity for alleged constitutional violations. This growth in damages claims, in turn, has revived the government's interest in the problems of providing assistance to its employees who are sued in their individual capacity for job-related activities. The primary form of assistance, of course, is the provision of an attorney, either a Department of Justice employee or private counsel. Expenses incurred by the Department for private counsel are paid out of the Department's general appropriation.[3] In light of the Department's interest in protecting both employee morale and any underlying federal interests involved in the lawsuits, payment of private counsel fees incurred in the defense of Department employees is warranted as "expenses necessary for the legal activities of the Department of Justice," as our appropriation usually provides. *See, e.g.*, Pub. L. No. 96–68, 93 Stat. 419 (1979). The Department has developed in the last decade extensive guidelines governing such representation. *See* 28 C.F.R. § 50.15.[4]

---

[2] The practice of defending such officers was made necessary in the early days of our country because the doctrine of sovereign immunity forbade suits against the United States. Claimants would therefore often sue the officer who had taken the wrongful action, alleging that he had acted outside the scope of his official capacity.

[3] Early examples of agency appropriations being used to pay private counsel fees can be found at 12 Op. Att'y Gen. 368 (1868), 9 Op. Att'y Gen. 146 (1858), 5 Op. Att'y Gen. 397 (1851), and 3 Op. Att'y Gen. 306 (1838). "When a ministerial or executive officer is sued for an act done in the lawful discharge of his duty, the government which employed him is bound, in conscience and honor, . . . not [to] suffer any personal detriment to come upon him for his fidelity, but will adopt his act as its own and pay the expense of maintaining its legality before the tribunal where it is questioned." 9 Op. Att'y Gen. 146, 148 (1838).

[4] The Comptroller General has long approved this use of our general appropriation. *See* 31 Comp. Gen. 661 (1952); *see also* 53 Comp. Gen. 301 (1973) (use of judiciary appropriation to pay for litigation costs when Department of Justice has declined representation).

7

In the 1980 Opinion, we advised the Civil Division that the Attorney General could expend money from the Department's general appropriation to settle claims against Department employees for damages caused by actions taken within the scope of their employment. As in the case of departmental payment of private counsel fees, our conclusion was based on the basic rule that a general appropriation may be used to pay any expense that is necessary or incident to the achievement of the underlying objectives for which the appropriation was made. General Accounting Office, *Principles of Federal Appropriations Law* 3–12 to 3–15 (1982). If the agency believes that the expenditure bears a logical relationship to the objectives of the general appropriation, and will make a direct contribution to the agency's mission, the appropriation may be used:

> It is in the first instance up to the administrative agency to determine that a given item is reasonably necessary to accomplishing an authorized purpose. Once the agency makes this determination, GAO will normally not substitute its own judgment for that of the agency. *Id.* at 3–14.

There is a clear logical connection between the achievement of an agency's underlying mission and protecting the agency's employees from financial liability for actions taken within the scope of their employment. As Attorney General Black noted in 1858, it will be difficult to recruit or maintain a superior federal work force if employees are fearful that they may face financial ruin for their actions notwithstanding the fact that they have acted within the scope of their employment.[5]

Similarly, the General Counsel for the Comptroller General has opined that the Department of the Interior may use its general appropriation to pay a judgment entered against two game wardens who had been convicted of trespass.[6] *See* GAO Opinion B-168571–O.M. (Jan. 27, 1970) (unpublished). The wardens had entered onto private property at the direction of their superiors in order to post "No Hunting" signs. The General Counsel turned first to the question whether the employees had been acting within the scope of their employment:

---

[5] 9 Op. Att'y Gen. 51, 52 (1858). In 1838 Attorney General Butler determined that the Navy could pay a judgment for damages and costs entered against a naval officer:

> The recovery was for acts done by Commodore Elliot in the performance of his official duty, and for costs occasioned by the defenses made by the United States. It is therefore one of those cases in which the officer ought to be fully indemnified; and the section to which I have referred may well be regarded as authorizing the department to pay the amount required for such indemnification, if, as already suggested, there be any funds within its control properly applicable to such a subject.

3 Op. Att'y Gen. 306 (1838). There is other language in the early cases and Attorney General opinions supporting the proposition that the government should and will indemnify such employees, but it is not clear whether the payment was made in these cases from an agency appropriation or through special legislation. *See Tracy* v. *Swartwout*, 35 U.S. (10 Pet.) 80, 98–99 (1836) ("Some personal inconvenience may be experienced by an officer who shall be held responsible in damages for illegal acts done under instructions of a superior; but, as the government in such cases is bound to indemnify the officer, there can be no eventual hardship."); 9 Op. Att'y Gen. 51, 53 (1857) ("In *Little* v. *Bareme*, 6 U.S. (2 Cranch) 170, the Government took no part in the defense, but it afterwards assumed the judgment, and paid it with interest and all charges.").

[6] *See Merovka* v. *Allen*, 410 F.2d 1307 (10th Cir. 1969).

It is apparent that the claimants acted at the direction of their superiors and with legal advice upon which they were entitled to rely. They were required to act in the line of duty, and they intended faithfully to carry out the law enforcement activity of the Bureau. Under these circumstances and especially since they were directed by their superiors, the government is obligated to compensate them.

*Id.* at 2.

He then examined whether the judgment should be paid out of what is familiarly called the Judgment Fund, 31 U.S.C. § 1304, or some other source:

[T]he judgment against the claimants is not sufficiently similar to a judgment against the United States to justify payment under 31 U.S.C. 724a [now codified at 31 U.S.C. § 1304]. On the other hand, the claimants' course of conduct resulting in their payment of the damages was sanctioned and directed by the Bureau of Sport Fisheries and Wildlife to the extent that it can reasonably be considered as law enforcement activity of the Bureau. Accordingly, reimbursement to the claimants should be charged to the Department of Interior appropriation available to the Bureau for necessary expenses of its law enforcement program.

*Id.* at 3.

The Comptroller General had earlier used the same analysis in determining that the Justice Department could use its general appropriation to indemnify an FBI agent for a fine imposed by a district court for contempt of court. 44 Comp. Gen. 312 (1964). The agent had refused, pursuant to Department regulations and instructions from the Attorney General, to answer certain questions concerning a Mafia figure. After first determining that the agent had been acting within the scope of his employment and that the Judgment Fund was not available, the Comptroller General concluded:

[I]t is a settled rule that where an appropriation is made for a particular object by implication it confers authority to incur expenses which are necessary or proper or incident to the accomplishment of the objective or purpose for which made. The FBI appropriation . . . provides in general terms for, among other things, "expenses necessary for the detection and prosecution of crimes against the United States."

\*        \*        \*

Accordingly, and since it appears from the facts reported and outlined herein that the expense of the fine reasonably would fall into that category, we conclude that payment of the contempt fine of $500 may be regarded as a proper charge against this appropriation.

9

*Id.* at 314–15.

More recently, the Comptroller General reached the same conclusion with respect to attorneys' fees assessed against FBI agents involved in a raid on the Black Panthers. 59 Comp. Gen. 489 (1980). After noting that the lawsuit "arose by reason of the performance of their duties as employees of the FBI," the Comptroller General stated flatly: "It has long been our view that the United States may bear expenses, including court imposed sanctions, which a Government employee incurs because of an act done in the discharge of his official duties." *Id.* at 492–93.

The Comptroller General has applied these principles in at least two cases raising the specific issue of individual liability for damages. In 1977, he issued an opinion addressing the issue of liability under 26 U.S.C. § 7217 for disclosure of a taxpayer's return. 56 Comp. Gen. 615 (1977). Although IRS employees were protected under a specific statute authorizing their indemnification, *see* 26 U.S.C. § 7423(2), employees of other agencies that might have access to the forms were not. The Comptroller General concluded that damage awards against these employees could be funded from their agencies' general appropriations. *Id.* at 619. In the second case, the Comptroller General concluded that the Drug Enforcement Administration could use its appropriation to settle a case in which two of its agents were charged with conduct violating the Fourth Amendment. *See* GAO Opinion B-176229 (Sept. 27, 1977) (unpublished).[7]

Finally, this Office relied upon these principles in its opinions holding that the Department of Defense could use one of its appropriations to fund the settlement of constitutional tort claims against four Army officers arising out of *Berlin Democratic Club* v. *Brown*, 410 F. Supp. 144 (D.D.C. 1978). *See* Memorandum for the Attorney General from Larry A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel (Aug. 15, 1979); Memorandum from Larry A. Hammond, Acting Assistant Attorney General, Office of Legal Counsel to Barbara Allen Babcock, Assistant Attorney General, Civil Division (Jan. 24, 1979).[8]

---

[7] The Comptroller General suggested that indemnification is not possible when an adverse final judgment is entered against an individual government employee on the issue of fault. Although the 1980 Opinion did not reach this issue, this Office advised the Civil Division shortly thereafter that our analysis also supported the conclusion that, in appropriate circumstances, the Attorney General has authority to reimburse Justice Department employees for final judgments entered against them individually. *See* Memorandum for Alice Daniel, Assistant Attorney General, Civil Division from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (Aug. 22, 1980).

As the Assistant Attorney General for the Civil Division has underscored, the Comptroller General has not made the settlement/final judgment distinction in other cases, "and in any event Comptroller General opinions are not binding on the Attorney General." Memorandum for the Attorney General from Richard K. Willard, Assistant Attorney General, Civil Division (Jan. 6, 1986). Moreover, a careful reading of the Comptroller General opinion in which the distinction was made suggests that it may actually relate to whether the adverse judgment reveals that actions of the officer were outside the scope of his employment. In any event, we believe that such a distinction is untenable, and we continue to adhere to previous opinions that indemnity is legally permissible both for settlements and final judgments.

[8] The Civil Division's 1984 Representation Study identified memoranda from Attorneys General Civiletti and Smith that appear to conflict with the view expressed in our 1980 opinion. Memorandum for Alice

Continued

## Conclusion

We have reviewed our 1980 opinion on this subject and have again concluded that the Attorney General may use the Department's general appropriation to indemnify Department employees for adverse money judgments, as well as for settled or compromised claims, arising out of actions taken within the scope of their employment.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[8] (. . . continued)
Daniel, Assistant Attorney General, Civil Division from Benjamin R. Civiletti, Attorney General (Nov. 20, 1980); Memorandum to William Webster, Director, Federal Bureau of Investigation from William French Smith, Attorney General (Nov. 17, 1981) (resolving "to adhere to the existing Department policy generally not to pay settlements on behalf of employees"). This apparent conflict may have led to uncertainty within the Department, resulting in statements by Department officials suggesting the need for express legislative authority. *See* Memorandum for the Attorney General from Richard K. Willard, Assistant Attorney General, Civil Division (Jan. 6, 1986). While these statements obviously may be weighed in your decision on whether to change the Department's indemnification policy and, if so, on how to alert Congress, they do not affect our analysis of the Attorney General's legal authority to indemnify.

11